UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | 2:24-CR-00019-DCLC-CRW |
| v. | ) ) | |
| SALMA ABDALKAREEM, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the United States' Objections to the Presentence Report [Doc. 83] and Defendant Salma Abdalkareem's Objections to the Presentence Report [Doc. 85]. At the November 19, 2025 hearing, the Court heard arguments from the parties on both sets of objections. These matters are now ripe for consideration.

**I.    Background**

On July 9, 2024, a federal grand jury returned a thirty-eight count superseding indictment charging Abdalkareem and her coconspirators Stephen Anagor and Chinagorom Onwumere with numerous offenses for their role in an international romance scam. [Doc. 30]. The scam resulted in the loss of nearly $400,000 from at least eight victims,[1] one of whom committed suicide after giving the scammers his life savings.  On June 16, 2025, Abdalkareem entered into a Plea Agreement whereby she pled guilty to Count 2 (Conspiracy to Commit Mail and Wire Fraud),

---

[1] This number is the total restitution owed to the victims and is not the individual loss amount attributed to Abdalkareem for sentencing purposes.

Count 29 (Aiding and Abetting Money Laundering), and Count 31 (Aiding and Abetting Money Laundering). [Doc. 64].

In the Plea Agreement, Abdalkareem admitted to the following facts describing how the scam operated and her role within it. Abdalkareem, originally from Sudan, entered the United States on a lottery visa before becoming a legal permanent resident. Her husband, codefendant Onwumere, followed her to the United States and joined the New Jersey National Guard. During basic training, he met and befriended codefendant Anagor, who shared with him a way to make money: Anagor's relative in Nigeria, identified as Coconspirator 1, made people "fall in love" on the computer and obtained money from them. For a cut of that money, individuals in the United States with domestic bank accounts received and laundered checks the victims mailed to them. Onwumere agreed to launder funds through accounts owned by him and Abdalkareem.

Abdalkareem did not know the specifics of how and when Coconspirator 1 and others were communicating with victims; however, she did know the funds she was depositing were the proceeds of fraudulent activity. When she received checks from the victims of the scam, she deposited the funds into her bank accounts, retained her share, and sent electronic transfers of the remainder to other individuals involved in the conspiracy. She did so largely at the direction of Onwumere, though she also had direct communications with Coconspirator 1, and on at least one occasion, she personally negotiated for a larger share of the proceeds.

Victim 1 was a retired teacher from Jonesborough, Tennessee who fell victim to the romance scam and believed he was in a relationship with a celebrity. As part of the scam, coconspirators in Nigeria sent Victim 1 nude photos, purporting to be the celebrity. A few weeks after sending the photos, the scammers then impersonated high-level federal law enforcement officials claiming that the photos leaked to the public and that Victim 1 was the prime suspect. The

scammers harassed and threatened Victim 1 with criminal action if he did not pay a series of fines. Neither Abdalkareem nor her codefendants knew these communications were occurring. On October 4, 2023, Victim 1 mailed Abdalkareem and Onwumere three personal checks. These checks were identified as check number 2515, made payable to the FBI and with the memo line reading "Agent Salma Abdalkareem," in the amount of $5,500; check number 2516 for $4,500 made payable to Salmasam LLC, a business owned by Abdalkareem; and check number 2517, again made payable to the FBI for $5,500. They received these checks via the mail at their residence, and an envelope from Victim 1 addressed to the FBI's Department of Payments/Fees was found at their home. Abdalkareem and Onwumere altered check number 2515, changing the payee from "FBI" to "FBED Salma Abdalkareem." Abdalkareem attempted to deposit the check, but the bank denied it due to the alteration. During a later call with the bank, Abdalkareem lied to the financial investigator, telling him that she had done business with Victim 1, had booked a travel package for him, and that he would be issuing a new check. Onwumere endorsed and deposited check number 2516 and tore up check number 2517 after realizing it was made payable to the FBI. Onwumere then sent a photo of the torn-up check to Coconspirator 1.

The coconspirators in Nigeria continued to threaten Victim 1. Purporting to be the Attorney General of the United States, they claimed the Supreme Court ordered Victim 1 to pay tens of thousands of dollars or else he would need to testify in front of his family and the world about the nude photos and his affair with the celebrity. The day after Victim 1 issued the three personal checks, he obtained a cashier's check for $41,000, made payable to Onwumere. The day after that, he obtained a second cashier's check, also for $41,000 but payable to Abdalkareem. This money was Victim 1's life savings. Onwumere deposited the first check, and Abdalkareem endorsed and deposited the second. The scammers relentlessly continued to demand more and more money from

Victim 1. Just over two weeks after issuing these checks, Victim 1 sent two suicidal messages to the Nigerian coconspirators, believing it to be the celebrity he was in a romantic relationship with. And on October 23, 2023, he committed suicide.

Victim 1 was one of many victims of this scam. At least seven other victims exist, with five who sent funds to Abdalkareem. In total, the Government seeks $388,500 in restitution for the identified victims.

On October 2, 2025, the Probation Officer issued the Presentence Investigation Report (PSR), to which both the Government and Abdalkareem raised multiple objections. The Court will address each objection in turn.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 32(i)(3)(B), after a party files objections to the PSR, the Court must either rule on the disputed portions of the PSR or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the Court will not consider the matter in sentencing. Fed. R. Crim. P. 32(i)(3)(B). The sentencing court's factual findings "help to ensure that defendants are sentenced on the basis of accurate information and provide a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) (internal quotation marks and alterations omitted). The Court must make factual findings by a preponderance of the evidence. *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007).

## III. The United States' Objections

### A. Objection One (Means of Identification Enhancement)

The United States argues that a two-level increase under U.S.S.G. § 2B1.1(b)(11)(C)(i) for using a means of identification unlawfully to create another means of identification applies to

Abdalkareem. As the Court announced during the hearing, this objection is **OVERRULED**, because there is no evidence that Abdalkareem created the fraudulent FBI card, that she agreed to its creation, or that she even knew it existed. Additionally, as the Probation Officer noted in the PSR Addendum, Abdalkareem's offense level has already been enhanced because the offense involved the misrepresentation that she was acting on behalf of a government agency. To apply the § 2B1.1(b)(11)(C)(i) enhancement would constitute impermissible double counting. *See United States v. Duke*, 870 F.3d 397, 404 (6th Cir. 2017) ("Impermissible doubling counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.").

### B. Objection Two (Conscious or Reckless Risk of Death Enhancement)

The Government contends that the two-level enhancement for conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16)(A) applies. This guideline applies to fraud offenses, and provides, "If the offense involved … the conscious or reckless risk of death or serious bodily injury… increase [the offense level] by 2 levels." U.S.S.G. § 2B1.1(b)(16)(A).

Several Circuit Courts of Appeal have addressed the meaning of § 2B1.1(b)(16)(A), and the majority interpret the enhancement to require that the defendant was either subjectively aware of the risk created by her conduct or objectively reckless in disregarding a risk that would have been obvious to a reasonable person. *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011); *see United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003) (holding that the enhancement applies only when the conduct created a risk of bodily injury and that the defendant either knew of the risk (conscious) or disregarded a risk that would have been obvious to a reasonable person and whose disregard constituted a gross deviation from reasonable care (reckless)); *United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001) (holding that a defendant

does not need to subjectively know that her conduct created a serious bodily risk). The Sixth Circuit has described these various approached but has not expressly adopted one. *United States v. Silber*, 456 F. App'x 559, 563 (6th Cir. 2012).

As the Tenth Circuit explained in *Maestas*, "[a] defendant's conduct involves a conscious risk if the defendant was subjectively aware that her conduct created a risk of serious bodily injury," while conduct involves a reckless risk "if the risk of bodily injury would have been obvious to a reasonable person." *Maestas*, 642 F.3d at 1321. Under this framework, reckless conduct is measured by an objective standard. *Id*. The Sixth Circuit has held that § 2B1.1(b)(16)(A) requires that the reckless risk be "actual, not conjectural." *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020) (citing *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000)). And the focus of the analysis must be on the "actual *risk* of serious bodily injury, not on whether there were actual injuries." *Id.*

Under § 1B1.3(a)(1)(A), a defendant is responsible for her *own* acts committed and for acts aided and abetted. Here, Abdalkareem's acts were simple: she received checks in the mail, deposited them, and transferred the proceeds to her coconspirators, retaining a portion for herself. She also altered one check from Victim 1 to conceal that it was payable to the FBI and later lied to a bank investigator about the check's purpose. In performing these actions, she had personal knowledge that her coconspirators were performing romance and law enforcement themed fraud schemes, and she knew the money she received were the proceeds from these illegal scams.

Under § 1B1.3(a)(1)(B), a defendant is also accountable for the acts and omissions of *others* if those acts were (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that criminal activity, and (3) reasonably foreseeable in connection with that criminal activity. This guideline provision allows sentencing courts to consider not only those

qualifying acts of coconspirators, but also any harms resulting from those acts. U.S.S.G. §§ 1B1.3(a)(1)(B). However, a defendant may not be held responsible for acts of others that fall outside the scope of the jointly undertaken activity. U.S.S.G. §§ 1B1.3(a)(1)(B), 1B1.3(a)(3).

Here, Abdalkareem initially agreed to launder money for a romance scam. Her coconspirators messages to victims -- romantic communications, impersonations of celebrities, and requests for money in relation to the romantic relationship -- were all within the scope of the jointly undertaken criminal activity, were in furtherance of it, and were reasonably foreseeable to Abdalkareem.

On or around October 4, 2023, Abdalkareem received the first check made payable to the FBI. At this point, she knew her coconspirators were also performing a law enforcement themed scam. When she altered a check payable to the FBI, attempted to deposit it, and lied to the bank about the true nature of the check, she personally participated in this expanded law enforcement scam. Thus, the scope of the jointly undertaken criminal activity grew to include the law enforcement component, and she is accountable for her coconspirators' impersonation of law enforcement officers and their associated demands and threats for money under that scheme.

However, Abdalkareem is not responsible for all acts of her coconspirators simply because she was part of the scheme. Under § 1B1.3(a)(1)(B), her responsibility extends only to acts within the jointly undertaken criminal activity that were reasonably foreseeable to her. Victim 1's suicidal communications to the Nigerian coconspirators – and their responses – were not within the scope of the criminal activity Abdalkareem agreed to undertake, nor were they reasonably foreseeable based on her role in this offense. The conspirator's knowledge of Victim 1's mental state is not imputed to Abdalkareem under these facts. Therefore, she cannot be held responsible for those

communications, and the Nigerian coconspirators' knowledge of Victim 1's suicidal state cannot be imputed to her.

Upon consideration of both her own acts and those of her coconspirators that she is responsible for under § 1B1.3(a)(1)(B), the enhancement does not apply to Abdalkareem.

First, there is no evidence that Abdalkareem had a subjective awareness that her conduct created a risk of death. Although the Nigerian coconspirators knew that Victim 1 was suicidal -- because he communicated that directly to them -- Abdalkareem had no access to those messages. She did not know that her actions contributed to Victim 1's suicide, nor did she have broader knowledge that her conduct created a risk of death to any victim.

Second, the Government has not shown, by a preponderance of the evidence, that Abdalkareem acted recklessly with respect to a risk of death. Abdalkareem participated in conspiracies to commit wire fraud and money laundering. Through her role, she learned information about the overall conspiracy as well as certain details about Victim 1. She knew that the coconspirators were perpetrating a romance scam on U.S. victims, and she knew that the checks mailed to her were the proceeds of fraud.

Through Victim 1's checks, she learned more details about the scheme. Around October 4, 2023, she received the first check from him -- a $5,500 check payable to the FBI. At that point, she knew the fraud had evolved into a law enforcement themed scam. With the other two checks dated October 4, 2023, she knew that Victim 1 was facing repeated demands from the coconspirators for money under this false law enforcement scam. Within two days, she and Onwumere received two more checks from the same victim—each for $41,000. This extreme escalation in payment amounts would cause a reasonable person to question what pressures the

victim was facing.  Combined, these facts certainly created *a* risk that the victim might become emotionally overwhelmed or distressed.  But they do not amount to an *obvious* risk of death.[2]

The only details Abdalkareem knew about Victim 1 personally were his name and address. She did not know his mental health, whether the $86,500 she deposited represented his life savings or only a portion of his wealth, or what specific messages he exchanged with the Nigerian coconspirators.  Based on the information available to her, a reasonable person in her place would not have understood that the fraud scheme presented an obvious risk of death, aside from general awareness – common to many fraud schemes -- that some victims may suffer significant financial or emotional harm. The Government has not shown that Abdalkareem consciously disregarded an obvious risk of death.

Section 2B1.1(b)(16)(A) has typically been applied in cases where the defendant's conduct bears a clear and direct link to physical harm resulting from the offense. *See, e.g., United States v. Chin*, 41 F.4th 16 (1st Cir. 2022) (applying the enhancement where a pharmacist knowingly sold contaminated drugs); *United States v. Hernandez*, 606 F. App'x 230 (5th Cir. 2015) (applying the enhancement to a prison guard who falsified safety-check reports for an inmate he knew posed a suicide risk); *United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) (applying the enhancement to a defendant who participated in staged, deliberate car accidents for the insurance proceeds).

Unlike those cases, the fraud scheme here does not inherently or obviously pose a risk of death or serious bodily injury. Apart from the suicidal messages that Abdalkareem never saw, nothing about this scheme distinguishes it, in terms of lethal risk, from ordinary romance or law-

---

[2]     The sentencing guidelines do not address how likely death or serious injury must be – it simply states if the defendant's offense involved "a risk of death," the enhancement applies. U.S.S.G. § 2B1.1(b)(16)(A); *see United States v. Babul*, 476 F.3d 498, 503 (7th Cir. 2007) (noting that the guideline speaks of "risk" rather than "substantial" or "material" risk, and applying the guideline when the defendant's crime created "some risk").

enforcement scams. While other romance and law enforcement scams have led to victims' suicides, the record contains no facts – known to Abdalkareem, that would have created a particular or obvious risk of suicide in this fraud scheme.

That Victim 1 in fact committed suicide does not control the analysis. As the Sixth Circuit has explained, the enhancement turns on whether the offense created a *risk of death*, not whether actual hard occurred. *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020). Although it is foreseeable that a person who pays $97,500 to supposed federal law enforcement agents may experience significant emotional or financial distress, the enhancement is applies only when the offense creates a risk of death or serious bodily injury, not merely the risk of severe emotional harm.

Because Abdalkareem's conduct did not create an obvious risk – either subjectively or objectively - to a reasonable person that any victim would commit suicide or otherwise suffer death or serious bodily injury, the Government's objection is **OVERRULED**.

### C. Objection Three (Guideline Calculations)

The Government objects to the offense level calculation based on its previous two objections. After overruling the objections, the original offense level calculation remains correct.

### D. Objection Four (Additional Grounds for Upward Departure)

The Court will address any variances and grounds for upward (or downward) departure at Abdalkareem's sentencing hearing on December 2, 2025.

## IV. Defendant's Objections

### A. Minor/Mitigating Role Adjustment

Abdalkareem contends that a minor or mitigating role adjustment pursuant to U.S.S.G. § 3B1.2 applies. A sentencing court may apply U.S.S.G. § 3B1.2 to reduce the base offense level if

the defendant's role in the offense was "substantially less" than other perpetrators. U.S.S.G. § 3B1.2 n. 3(A). The minor role adjustment is a fact-based determination and the sentencing court may consider the following factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

*United States v. Taylor*, 818 F. App'x 495, 501 (6th Cir. 2020).

As the Court noted at the hearing, this objection is **OVERRULED**. Though Abdalkareem did not know the entire scope and structure of the criminal activity, she was well-aware of the broad strokes. She understood the Nigerian coconspirators operated a romance scam, and after receiving checks addressed to the FBI, she also knew they operated law enforcement scams. That she did not know the specific messages sent to victims does not diminish her overall knowledge of the scope of the criminal activities. Further, she participated in the scam to the same degree as an average conspirator. She had direct communication with Coconspirator 1 in Nigeria, she received the victim's checks, deposited them into her accounts, and she attempted to cover-up her alteration of the check addressed to the FBI. Additionally, she negotiated for a greater share of the proceeds and in fact did share in the proceeds. While she performed some of these tasks at the direction of Onwumere, she also acted independently at times. Abdalkareem certainly played a lesser role in the conspiracy than Onwumere and Anagor, but not a substantially lesser role.

### B. Zero Point Offender Status

Abdalkareem also argues that the downward adjustment for zero-point offenders under U.S.S.G. § 4C1.1 applies. This guideline only applies to defendants who satisfy all the § 4C1.1

criteria, one of which is that "the defendant did not personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(6). Whether a substantial financial hardship occurred is determined independently of the § 2B1.1(b)(2) application, though courts must consider the § 2B1.1 Application Note 4(F) factors. U.S.S.G. § 4C1.1(b)(3). One such factor is whether the offense resulted in the victim "suffering substantial loss of a retirement, education, or other savings or investment fund." U.S.S.G. § 2B1.1 n. 4(F).

Here, Abdalkareem personally caused Victim 1 to lose his life savings when she and Onwumere deposited $86,500 of Victim 1's money into bank accounts under her control from checks that he mailed to them. Because she personally caused a substantial financial hardship, she cannot qualify as a zero-point offender, and this objection is **OVERRULED.**

### C. Factors that May Warrant Departure

The Court will address any variances and grounds for downward departure at Abdalkareem's sentencing hearing on December 2, 2025.

### D. Loss Amount

At the hearing, Abdalkareem raised an additional objection that the PSR incorrectly calculated the loss amount. Under the guidelines, "loss" is defined as the greater of actual loss or intended loss. U.S.S.G. § 2B1.1(b)(1) n. (A). "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offence, while "intended loss" refers to the pecuniary harm the defendant purposely sought to inflict. U.S.S.G. § 2B1.1(b)(1) n. (C). The Sixth Circuit has explained that when a fraud scheme includes both successful and unsuccessful attempts, the total loss may include both actual and intended losses. *United States v. Vysniauskas*, 593 F. App'x 518, 525-26 (6th Cir. 2015)(emphasis added); *see United States v. You*, 74 F.4th 378, 397-98 (6th Cir.

2023) (holding that intended loss is included in the total loss). Because intended loss includes all actual losses, courts must be careful not to double count. *Vysniauskas* 593 F. App'x at 525.

Abdalkareem claims that only the losses she and Onwumere personally received or deposited should be included in the total loss amount. However, under U.S.S.G. § 1B1.3(a)(1)(B), the Court must take into account all acts of others that were (1) within the scope of the jointly undertaken criminal activity, (2) in furtherance of that activity, and (3) reasonably foreseeable in connection with the activity.

The record establishes that Onwumere, and through him, Abdalkareem, joined the conspiracy to launder money from an international romance scam beginning in June 2023. Abdalkareem knew the scam extended beyond herself and her husband: she knew Anagor was involved, and she sent portions of the proceeds to others in the United States and Nigeria. The actions of the Nigerian coconspirators in threatening and demanding money from their romance scam victims, and the actions of American coconspirators in depositing and laundering the scammed funds are within the scope of the jointly undertaken criminal activity. Both sets of actions were necessarily in furtherance of the criminal activity and were reasonably foreseeable to Abdalkareem.

Accordingly, all losses related to the scams that occurred during the time of her involvement and can be connected in some manner to Abdalkareem should be calculated in the loss amount. *See United States v. Ellis*, 817 F. App'x 780, 789 (11th Cir. 2020) (upholding loss calculation in a romance and other scams where the district court included all losses that occurred while defendants were part of the scam and that were connected "in some manner" to them).

The following table presents the applicable losses:

| Date | Victim | Description | Actual Loss | Intended Loss |
|---|---|---|---|---|
| 8/17/2023 | 1 | Visa gift card | $400 | |
| 10/4/2023 | 1 | Check number 2515 (attempted deposit) | | $5500 |
| 10/4/2023 | 1 | Check number 2516 | $4500 | |
| 10/4/2023 | 1 | Check number 2517 (torn up by Onwumere) | | $5500 |
| 10/5/2023 | 1 | Check number 41882 | $41000 | |
| 10/6/2023 | 1 | Check number 41889 | $41000 | |
| 10/22/2023 | 1 | Attempted loss based on the same scam on Victim 2 | | $22500 |
| 6/15/2023 | 2 | Check number 988102 | $15500 | |
| 9/28/2023 | 2 | Check number 883502808 | $11850 | |
| 10/23/2023 | 2 | Check number 88350289 | $11850 | |
| 11/2/2023 | 2 | Check number 996036 | $22500 | |
| 12/20/2023 | 2 | Fraudulent check | | $7000 |
| 1/2/2024 | 2 | Fraudulent check | | $13200 |
| Various | 2 | Gift card purchases | $9505 | |
| Various | 3 | Gift card purchases | $7000 | |
| Various | 5 | Checks | $41000 | $7500 |
| 6/13/2023 | 6 | Check | $37500 | |
| 8/3/2023 | 7 | Check | $3000 | |
| 8/30/2023 | 8 | Wire Transfer | $1141 | |
| | | **TOTAL** | **$247,746** | **$61,200** |

Combined, the actual and intended losses total $308,946. Thus, the initial guideline loss calculation of more than $250,000 but less than $550,000 was correct, and this objection is **OVERRULED.**

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge